## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SEMCRUDE, L.P., <u>et al.</u>, | ) | Case No. 08-11525 (BLS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| MULL DRILLING COMPANY, INC., | ) | |
| <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-51446 |
| | ) | (KANSAS) |
| | ) | |
| SEMCRUDE, L.P., <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | | |

## <u>OPINION</u>[1]

Before the Court are a number of cross-motions for summary
judgment on a complaint seeking declaratory relief.  These
include  the Plaintiffs' Motion for Summary Judgment on Phase I
Issues [Docket No. 161], filed by certain Kansas producers of oil
and gas (the "Kansas Producers"); Bank of America, N.A.'s Motion
for Summary Judgment on the Threshold Questions of Law [Docket
No. 164], filed by Bank of America, N.A., as administrative agent
for the Debtors' pre-petition lenders (the "Banks"); J. Aron &
Company's Consolidated Motion for Summary Judgment [Docket No.

---

[1]    This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

152], filed by J. Aron & Company ("J. Aron"), an intervening party; and various joinders thereto as reflected on the docket in this adversary proceeding.

For the following reasons, the Court will grant in part the Motion of the Banks and deny the Motion of the Kansas Producers.

## I.   PRELIMINARY STATEMENT

The key question before the Court in this declaratory judgment action is whether a security interest perfected only in Kansas by virtue of the automatic perfection in K.S.A. § 84-9-339(a) is subordinate to a security interest that was duly perfected against the Debtors in this case in accordance with Article 9's rules regarding perfection.  For the following reasons, the Court finds that, as a matter of law, such an automatically perfected security interest will be the junior security interest.  Accordingly, summary judgment will be entered in favor of the Banks.

The Court recognizes that it is ruling today on issues of great significance to the parties both in economic terms and as a business reality.  There is little doubt that this ruling will be appealed.  In light of these considerations, the Court will certify this Opinion and Order pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (iii) for direct appeal to the United States Court of Appeals for the Third Circuit.

2

## II. **BACKGROUND**

A. General Background

On July 22, 2008 (the "Petition Date"), SemGroup, L.P. ("SemGroup"), and certain direct and indirect subsidiaries (collectively referred to hereinafter as the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Included among these entities are three companies that allegedly purchased oil and/or gas (the "Kansas Product") from the Kansas Producers: SemCrude, a limited partnership organized under the law of Delaware (Silverstein Aff., Ex. 6); Eaglwing, a limited partnership organized under the law of Oklahoma (Id. at Ex. 8); and SemGas, a limited partnership organized under the law of Oklahoma (Id. at Ex. 7). The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Code.

On August 5, 2008, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors Committee"). By Order dated October 15, 2008, the Court directed the U.S. Trustee to appoint and constitute a committee to represent the interests of producers of

3

oil and gas who sold product to the Debtors (the "Producers Committee")[Case No. 08-11525, Docket No. 1774].  Both the Creditors Committee and the Producers Committee have retained professionals and have actively participated in these cases.[2]

Founded in February 2000, the Debtors engage in a number of different businesses, each related to the energy industry. Included among the Debtors are several corporations which engage in the business of purchasing various forms of energy products, such as crude oil and natural gas, from producers and then subsequently reselling these products to refiners and other resellers in various types of sale and exchange transactions. Prior to the Petition Date, SemCrude, Eaglwing and SemGas, together with other Debtors, maintained a centralized cash management system in accounts at the Bank of Oklahoma.  Cash collections by the Debtors were deposited into these accounts (Eaglwing, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1927]; SemCrude, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1926]; SemGas, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1936]).[3]  The consolidated

---

[2]    The Court notes that the Producers Committee is, by design, not a party to this litigation.

[3]    One of the Debtors, SemCrude, also maintained a bank account in Massachusetts with Bank of America, and a de minimis account with First State Bank in Dumas, Texas.  The latter account had a balance of less than $5,000 on the Petition Date.

revenues of the Debtors during fiscal year 2007 were approximately $13.2 billion.

Historically, as part of their overall business strategy, the Debtors sought to establish a margin on their anticipated purchases of energy products by selling energy products for physical delivery to customers or by entering into future delivery obligations under futures contracts on the New York Mercantile Exchange ("NYMEX") and over-the-counter ("OTC") markets.  In the weeks leading up to the Petition Date, volatile energy  prices increased the Debtors' margin requirements, causing a negative impact on the Debtors' liquidity positions. These cash flow problems were further exacerbated by catastrophic trading losses.  On July 16, 2008, the Debtors transferred their NYMEX trading account to Barclays Bank PLC, an action that converted loss contingencies into recognized losses that exceeded $2.4 billion.  These trading losses and increased margin requirements eventually prevented the Debtors from meeting their margin calls, and prompted their Chapter 11 filings.[4]

As of the Petition Date, the Banks asserted secured claims

(SemCrude, L.P. First Amended Schedules/Statements, Sch. B [Case No. 08-11525, Docket No. 1926]).

[4]    The events giving rise to these bankruptcy proceedings have been the subject of an extensive investigation by a Court-appointed examiner. (See Final Report of Louis J. Freeh, Bankruptcy Court Examiner, dated April 15, 2009 [Case No. 08-11525, Docket No. 3701]).  The Court's remarks in Section II are intended as background only.

against the Debtors and their affiliates (as either borrowers or guarantors) in the aggregate amount of approximately $2.55 billion.  Pursuant to their Amended and Restated Security Agreement, the Banks assert duly perfected security interests in substantially all of the Debtors property.[5]

B. Factual Background Regarding the Oil and Gas Industry in

   Kansas

   The parties to this litigation have expended significant time and effort in educating the Court as to the history and particulars of oil and gas ownership and production in Kansas.[6] While the Court is ruling herein on a discrete question of law – the priority between competing security interests – it is both helpful and necessary to review this background in order to place this dispute in a proper framework.

---

[5]    The Debtors have stipulated to the extent, validity and priority of the Banks' security interests.  (See Final Order Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Prepetition Secured Parties, at  3 [Case No.  08-11525, Docket No. 1420]).  Pursuant to the Producer Claims Procedures Orders (defined and described infra), final determination of the validity of the Banks' liens is reserved for further proceedings.  At this stage, the parties seek a declaratory judgment regarding the relative priority of the Banks' security interests (assuming their validity for the moment) as against the rights of the Kansas Producers under applicable state law.

[6]    The Court's knowledge of this industry is informed by expert reports and affidavits submitted by the parties in support of their respective summary judgment motions.

Mineral rights may be severed from the fee simple absolute ownership of property and thus owned separately from the surface interest.  (Ks. Pls. Br., Ex. B at Ex. A, ¶ 10).  Before extraction, oil and gas are treated as real property; but upon extraction, minerals become "goods."  K.S.A. § 84-2a-103-h. The term "as-extracted collateral" thus refers to oil, gas or other minerals that are subject to a security interest before extraction from the ground.  (See Del. Code tit. 6, § 9-301; Kan. Stat. Ann. § 84-9-102(a)(6)).

Mineral owners rarely develop their minerals themselves. The technology and business of oil and gas exploration and development is complicated and expensive; few mineral owners possess the expertise or capital they need to act on their own. (Ks. Pls. Br., Ex. B at Ex. A ¶ 11).

Mineral owners typically transfer their mineral rights to an oil company through an oil and gas lease.  A fee simple owner or severed mineral owner who grants a lease is called a lessor.  A lessor typically receives a cash payment for granting the lease and retains a royalty, a percentage share of the oil and gas produced, or a percentage share of the value or revenues of production free of the costs of production. (Id. ¶ 13).

The person or oil company that receives a lease grant is called a lessee, and holds thereby the working interest, which includes the right to search, drill for, develop, produce, and

market from the leased land.  Often, a lessee will spread the cost of acquiring, evaluating, and exploring a lease by selling undivided percentages of the working interest to investors.  The owners of the working interest have the right to all of the oil and gas they produce from the land, other than that which goes to royalty owners, but must pay all costs of production.  (Id.).

Both mineral owners and lessees often create from their interests additional types of interests in favor of other parties.  These interests include "nonparticipating royalty" interests; "overriding royalty" interests and "carried" interests.  (Id. ¶ 14).

Operators/working interest owners must obtain permission to drill from certain state agencies that are charged with optimizing production of oil and gas.  They require drilling permits from the appropriate agency, and must comply with spacing rules designed to keep wells far enough apart to minimize the amount of drainage from one tract to another.  Typically, it is necessary to put together several leases to have enough acreage to form a spacing unit.  In addition, after wells have produced to the point that their production levels begin to decline, wells in several spacing units may be unitized, either voluntarily by their lessees, or by order of a state conversion agency, to maximize production from the formation.  Unitization refers to the joint operation of all the leases and spacing units over a

8

producing formation, usually in conjunction with
enhanced-production techniques, which may substantially increase
the percentage of oil and gas that is ultimately recovered.  (Id.
¶ 16).

        The lease owners in a spacing unit select one of their
number to act as the unit operator.  An operator is responsible
for day-to-day operation of the leases within a spacing unit.  To
facilitate decision-making, the operator and the other
working-interest owners in a spacing unit enter into an operating
agreement.  An operating agreement sets out the parties'
agreement with respect to the appointment of the operator, the
operators' rights and duties, initial drilling, further
development, the sharing of operations costs and revenues, the
marketing and sale of oil and gas, and accounting.  (Id. ¶ 17).
As a practical matter, an operating agreement is designed to set
forth a process by which the well is drilled and the production
is established, and to govern the operations of a productive well
after it has been established.  An operating agreement combines
or pools the leases and fractional interests of the parties for
operating purposes so that many leases are operated as if they
were one.  (Ks. Pls. Br., Ex. B at Ex. A ¶ 17).

        Oil produced from a well by the operator is either
temporarily placed in storage tanks and then transported by
truck, or placed into a gathering line with other product to be

9

delivered to a pipeline and transported.  Natural gas is always directed from the well through gathering lines into a pipeline. Transfer of title for either oil or gas may take place at a point of transfer on the spacing unit or at a market center or hub or at any place in between.  (Id. ¶ 20).

Typically, royalty owners do not take their oil and gas in kind; royalty owners either sell to the operator or the operator markets their shares.  The operators usually act on behalf of the interest owners and sell for the account of the other owners of legal interests in the oil and gas.  For example, Kansas production was sold typically to Debtors by the operators of the Kansas wells, as the party authorized to market and sell the production from the Kansas wells.  (Ks. Pls. Br. ¶¶ 11-12).  Less frequently, purchasers contract directly with the owners of the oil and gas, but require that the unit operator accept payment on behalf of all the sellers in the unit and disburse the proceeds. In either case, the purchaser of oil and gas usually pays the proceeds of sales to the unit operator, who in turn distributes the proceeds to the interest owner.  (Ks. Pls. Br., Ex. B at Ex. A ¶¶ 22-23).

Those who disburse proceeds of oil and gas sales use division orders to protect themselves against claims that they have improperly paid to interest owners.  A division order is a statement executed by all parties who claim a legal interest in

10

the oil and gas and in the funds generated by its sale, agreeing
how the proceeds of oil and gas sales are to be distributed to
them.  Interest owners who sign division orders and receive
payments consistent with the division orders cannot later
complain that they were not paid properly.  (Id. ¶ 24).

In practice, as a result of severance of the mineral estate
from the surface estate and partial sales of the minerals, it is
not uncommon to find hundreds of royalty owners with interests in
a single well.  Thus, the task – typically reserved to operators
– of distributing proceeds to royalty owners is complex.

The industry custom is that purchasers of oil and gas pay
amounts due to the owners on the 20th day of the month following
the delivery of oil and on the 25th day of the month following
delivery of gas.  (Ks. Pls. Br., Ex. B at Ex. A ¶ 25).

C. Producer Claims

In the course of their business, several of the Debtors
(specifically, SemCrude, SemGas and Eaglwing) entered into
agreements with a large number of oil and gas producers located
in at least eight different states (collectively referred to
hereinafter as the "Oil and Gas Producers") to purchase oil and
gas.  The Kansas Producers, a subgroup of the oil and gas
producers, are generally owners of working interests in oil and
gas production from various wells located throughout Kansas, and
many are operators of numerous wells pursuant to operating

11

agreements with interest owners.  As operators, the Kansas
Producers are authorized to market and sell oil and gas from the
wells they operate, attributable to and for the benefit of their
own working interests and for the benefit of non-operating
interest owners and royalty interest owners.  In addition, some
of the Kansas Producers own non-operating interests in numerous
wells that are operated by other parties who sold production to
the Debtors.

During the relevant period (from June 1 through July 21,
2008), the Kansas Producers produced oil and gas from hundreds of
wells situated in Kansas that was purchased by the Debtors.  As
noted previously, under general terms between the parties, the
Debtors were obligated to pay for the Kansas Producers'
production on July 20 and July 25, 2008, for June oil and gas
sales, and on August 20 and 25, 2008, for July oil and gas sales.

Historically, the amounts owed on these contracts had been
paid by the Debtors without incident in accordance with the above
payment schedule.  The Debtors' liquidity crisis and bankruptcy
filings in the summer of 2008, however, changed this pattern.
When the Debtors filed their Chapter 11 petitions on July 22,
2008, the Oil and Gas Producers, including the Kansas Producers,
had yet to receive payment for the oil and gas they had sold to
the Debtors between June 1, 2008 and the Petition Date.

The failure to pay the amounts owed on these contracts left

12

over a thousand Oil and Gas Producers, including many in Kansas,
looking for payment and seeking to determine in this Court what
rights, if any, they had in the oil and gas they had sold to the
Debtors (or the proceeds from the Debtors' sale of such product)
between June 1 and the Petition Date under the laws of their
respective states.  Within the month following the Petition Date
alone, hundreds of reclamation demands were made upon the
Debtors.  Many separate adversary proceedings relating to these
reclamation demands or purported liens on the oil and gas in
question were commenced.  A number of emergency motions, seeking
either injunctive relief to prevent the sale or disposition of
the oil and gas in question or a lifting of the automatic stay to
proceed against it, also were filed in this Court within weeks of
the Petition Date.

D. Producer Claims Procedures Orders

      In an attempt to prevent a multiplicity of actions and
preserve the resources of the Debtors and the Court, the Debtors
filed a motion for authorization to establish omnibus procedures
for, inter alia, the resolution of the rights and priorities of
the Oil and Gas Producers' claims pursuant to sections 105(a) and
362 of the Code and Rule 9019(a) of the Federal Rules of
Bankruptcy Procedure [Case No. 08-11525, Docket No. 600].
Following the filing of this motion, representatives of certain
Oil and Gas Producers met with representatives of the Debtors to

13

discuss the procedures that could be utilized in such a structure.  Through these extensive negotiations, the Debtors and the Oil and Gas Producers reached agreement on a set of procedures that could be used to resolve these issues, and presented this structure to the Court for approval on September 17, 2008.  The Court has entered  two orders (the "Producer Claims Procedures Orders") adopting this proposed structure [Case No.  08-11525, Docket Nos. 1425; 1557].

The structure approved by the Court calls for the Oil and Gas Producers to initiate one adversary proceeding against the Debtors for each state in which the Oil and Gas Producers sold oil or gas to the Debtors, a total of eight states.  The purpose of these adversary proceedings is for the Oil and Gas Producers to obtain a declaratory judgment establishing (i) what rights, if any, are afforded by each respective state's law to a producer of oil or natural gas who sells oil or natural gas to a first purchaser, such as the Debtors here, and (ii) the priority of these rights relative to the Banks' asserted security interests in the Debtors' existing and after-acquired inventory.  All of the Oil and Gas Producers were free to participate in this litigation, and the Producer Claims Procedures Orders expressly provided that the results of the litigation would be binding upon the Oil and Gas Producers irrespective of whether they actually participated in this process.

As may be apparent from the foregoing description, the
claims of the Kansas Producers involve many individual
transactions.  Accordingly, the actual calculation and allowance
of individual Kansas Producers' claims is not presently before
the Court.  Likewise, the determination of the extent, validity
and priority of the Banks' security interests is not presently
before the Court (but is reserved for further proceedings), such
that for purposes of this Opinion, the Court and the parties are
presuming the validity and perfection of these asserted security
interests.

In the present case, the Court will determine the rights,
status, and relative priority of the interests of the Texas
Producers in the crude oil and natural gas they sold to the
Debtors between June 1, 2008 and July 22, 2008 and the proceeds
thereof.

This matter has been fully briefed.  The Court has conducted
two full days of oral argument on these and related motions in
May, 2009.  It is ripe for decision.

## II. <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction over this matter pursuant to 28
U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this
Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of
this adversary proceeding constitutes a core proceeding under 28
U.S.C. § 157(b)(2)(A), (B), (K), and (O).

15

### III. **STANDARD OF REVIEW**

The parties have filed cross-motions for summary judgment on the Kansas Producers' claim for declaratory relief. The Court notes that "the standards under which to grant or deny summary judgment do not change because cross-motions are filed." In re U.S. Wireless Corp., Inc., 386 B.R. 556, 560 (Bankr. D. Del. 2008).

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056. In doing so, the Court must view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party. In re Elrod Holdings Corp., 394 B.R. 760, 763 (Bankr. D. Del. 2008).

In order to avoid summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. U.S. Wireless, 386 B.R. at 559. An issue of material fact is genuine if the factfinder could return a judgment for the nonmoving party on the disputed issue. Elrod Holdings, 394 B.R. at 763. If the nonmoving party fails to present facts establishing a genuine issue for trial, the moving

party is entitled to summary judgment.  Thus, the Court must ask:
"(1) is there no genuine issue of material fact and (2) is one
party entitled to judgment as a matter of law?"  <u>Gray v. York
Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3rd Cir. 1992) (quoting
<u>Country Floors, Inc. v. Gepner</u>, 930 F.2d 1056, 1060 (3d Cir.
1991)).

In this case, the underlying claim on which both sides seek
summary judgment is one for declaratory relief.  It is well-
settled that declaratory relief is available "to settle actual
controversies before they ripen into violations of a law or a
breach of duty."  <u>United States v. Fisher-Otis Co.</u>, 496 F.2d
1146, 1151 (10th Cir. 1974); <u>see</u> <u>Step-Saver Data Sys., Inc. v.
Wyse Tech.</u>, 912 F.2d 643, 647 (3d Cir. 1990).  Such relief is
appropriate where "there is a substantial controversy, between
parties having adverse legal interests, of sufficient immediacy
and reality."  <u>Armstrong World Indus., Inc. by Wolfson v. Adams</u>,
961 F.2d 405, 411 (3d Cir. 1992) (quoting <u>Md. Cas. Co. v. Pacific
Coal & Oil Co.</u>, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826
(1941)).

## IV. <u>DISCUSSION</u>

Presently before the Court are cross-motions for summary
judgment on a complaint seeking declaratory relief.  As detailed
at length below, the parties dispute not only which state law or
laws govern this dispute, but also the application of those

17

respective laws.

A. The Parties' Positions

The Kansas Producers assert in their motion for summary judgment that, pursuant to Kansas § 9-339a, they are the holders of perfected, purchase money security interests ("PMSIs") in all Kansas Product sold to the Debtors and any resulting proceeds held by the Debtors.  As such, the Kansas Producers argue that their rights are prior to the Banks' security interest.[7]

The Banks contend that perfection of the security interests claimed by the Kansas Producers pursuant to Kansas § 9-339a are governed by either Delaware or Oklahoma law, depending upon the relevant Debtor and its place of incorporation pursuant to the choice of law provisions in Article 9 of the UCC.  These provisions were adopted uniformly by each state (including Kansas) at issue in this adversary proceeding.  To the extent that the Kansas Producers did not perfect their Kansas § 9-339a

---

[7]     Because of the similarity of Kansas § 9-339a and a Texas statute that is currently being interpreted by the Court in a related, contemporaneously-filed proceeding, styled Arrow Oil & Gas, Inc. v. SemCrude, L.P., Case No. 08-51444, the Kansas Producers have adopted the arguments and authorities noted in the briefs of the Oil and Gas Producers in that proceeding, to the extent that they also apply to Kansas § 9-339a.  (See Ks. Pls. Opp. Br. at 4).  Likewise, at oral argument the Kansas Producers and the Banks adopted or incorporated by reference relevant points raised in oral argument in the Texas adversary proceeding. Accordingly, the Court will address these incorporated arguments throughout this opinion as if they were made by the Kansas Producers, to the extent that they apply to Kansas § 9-339a.

security interests in either Oklahoma or Delaware before the
Petition Date, the Banks contend that the Kansas Producers
possess unperfected security interests subordinate to the
security interest of the Banks.

The Banks also make two arguments in the alternative.
First, they argue that Kansas § 9-339a only provides for
perfecting a security interest in "as-extracted collateral," and
that none of the collateral at issue in this case fits the Kansas
UCC's definition of "as-extracted collateral."  Accordingly, the
Banks contend, the Kansas Producers have unperfected security
interests even if Kansas law were to govern perfection.  Second,
the Banks assert that even if Kansas law governs and provides the
Kansas Producers with perfected security interests, Kansas law
limits the Kansas Producers' special PMSI priority arising
pursuant to Kansas § 9-339(a) to (i) the remaining oil and gas
inventory of the Debtors as of July 22, 2008, the day the Debtors
filed bankruptcy, and (ii) any proceeds from the sale of such oil
and gas that the Debtors received on or before delivery of the
Kansas Product.  The relative priority of any security interests
not falling into either of these two categories, the Banks argue,
is instead governed by the "first to file or perfect" rule found
in Kansas § 9-322.

B. <u>Analysis</u>

The Court finds summary judgment appropriate in this case

19

because the parties are seeking declaratory relief regarding purely legal questions.  Consequently, as described at length below, there is no genuine issue of material fact that precludes the granting of summary judgment.

In addressing the dispute before it, the Court is faced as a threshold matter with choice of law questions involving security interests.  Given the uniformity found in most states' versions of Article 9 of the UCC, choice of law issues regarding security interests are rarely litigated.  Because Kansas § 9-339a is a non-uniform amendment to Kansas' version of the UCC, however, the Court's resolution of the instant summary judgment motions will differ significantly based on what state law(s) govern perfection of the Kansas Producers' purported security interests, as well as what state law(s) govern the effect of that perfection or nonperfection, and the priority among multiple perfected security interests.  An overview of each relevant states' respective law follows.

### 1. Kansas law

As a preliminary matter, the Court notes that there is no case law, state or federal, construing Kansas § 9-339a.  As such, in interpreting the statute the Court is obliged to predict state law.  See generally Packard v. Provident Nat. Bank, 994 F.2d 1039, 1049 (3d Cir. 1993) (discussing the role of a federal court when predicting state law).  When a federal court sets out to

predict state law, it sits, in effect, as a state supreme court. Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967).  Any relevant decisions of that state's own lower courts must therefore be researched thoroughly and given great weight, at least in the absence of convincing evidence showing that the state supreme court would not follow them.  See Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177-78, 61 S.Ct. 176, 178, 85 L.Ed. 109 (1940).

In so doing, this Court employs Kansas' rules of statutory construction.  When Kansas courts are called upon to interpret statutes, "the fundamental rule governing that interpretation is that 'the intent of the legislature governs if that intent can be ascertained.  The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted.'" In re Adoption of G.L.V. and M.J.V., 190 P.3d 245, 251-52 (Kan. 2008) (quoting State ex rel. Stovall v. Meneley, 22 P.3d 124, 143 (2001)).  It is for this reason that, "when the language of a statute is plain and unambiguous, courts 'need not resort to statutory construction.'"  Id. (quoting In re K.M.H., 169 P.3d 1025, 1042 (2007)).  That is, "'[w]hen the language is plain and unambiguous, an appellate court is bound to implement the expressed intent.'" Id. (quoting State v. Manbeck, 83 P.3d 190, 227 (2004)).  But if "'the face of the statute leaves its construction uncertain, the court may look to the historical

21

background of the enactment, the circumstances attending its
passage, the purpose to be accomplished, and the effect the
statute may have under the various constructions suggested.
[Citation omitted.]'" Id. (quoting Robinett v. The Haskell Co.,
12 P.3d 411, 416 (2000)).

Additionally, Kansas courts should generally "construe
statutes to avoid unreasonable results and should presume that
the legislature does not intend to enact useless or meaningless
legislation." Id. (quoting Hawley v. Kansas Dept. of
Agriculture, 132 P.3d 870, 889 (2006)). Kansas courts must
determine the legislature's intent behind particular statutory
language "'from a general consideration of the entire act.
Effect must be given, if possible, to the entire act and every
part thereof. To this end, it is the duty of the court, as far
as practicable, to reconcile the different provisions so as to
make them consistent, harmonious, and sensible. [Citation
omitted.]'" Id. (quoting In re Marriage of Ross, 783 P.2d 331,
334 (1989)). Moreover, if a general and specific statute cannot
be construed in harmony, the specific statute will control unless
it is clear that the legislature wanted the general statute to
control. State ex rel. Tomasic v. Unified Gov't of Wyandotte
County/Kansas City, 955 P.2d 1136, 1152 (1998).

a. Perfection and covered collateral

As noted above, the Kansas Legislature enacted Kansas § 9-

22

339a as a non-uniform amendment to Kansas' version of the Uniform Commercial Code.  Subsection (a) of Kansas § 9-339a provides for the creation of a security interest in favor of "interest owners":

> This section provides a security interest in favor of interest owners (as secured parties) to secure the obligations of the first purchaser of oil and gas production (as debtor) to pay the purchase price.  A signed writing giving the interest owner a right under real estate law operates as a security agreement created under article 9 of chapter 84 of the Kansas Statutes Annotated, and amendments thereto.  The act of the first purchaser in signing an agreement to purchase oil or gas production, in issuing a division order, or in making any other voluntary communication to the interest owner or any governmental agency recognizing the interest owner's right operates as an authentication and adoption of the security agreement in accordance with K.S.A. 84-1-201(39), and amendments thereto.

K.S.A. § 84-9-339a(a).

The term "interest owner" is defined as "a person owning an entire or fractional interest of any kind or nature in oil or gas production at the time of severance, or a person who has an express, implied or constructive right to receive a monetary payment determined by the value of oil or gas production or by the amount of production."  Id. at § 9-339a(p)(2).  A "first purchaser," meanwhile, is defined as "the first person that purchases oil or gas production from an operator or interest owner after the production is severed, or an operator that

23

received production proceeds from a third-party purchaser who acts in good faith under a division order or other agreement signed by the operator under which the operator collects proceeds of production on behalf of other interest owners." <u>Id.</u> at § 9-339a(p)(3).[8]  An "operator" is "a person engaged in the business of severing oil and or gas production from the ground, whether for the operator alone, for other persons alone or for the operator and others." <u>Id.</u> at § 9-339a(p)(4).

As noted above, the statute treats an agreement to purchase

---

[8]     The definition of "first purchaser" also states that:

> [t]o the extent the operator receives proceeds attributable to the interest of other interest owners from a third-party purchaser who acts in good faith under a division order or other agreement signed by such operator the operator shall be considered to be the first purchaser of the production for all purposes under this section, notwithstanding the characterization of other persons as first purchasers under other laws or regulations.  To the extent the operator has not received from the third-party purchaser proceeds attributable to the operator's interest and the interest of other interest owners, the operator is not considered the first purchaser for the purposes of this section, and is entitled to all rights and benefits under this section. Nothing herein shall impair or affect any rights otherwise held by a royalty owner to take its share of oil or gas in kind or receive payment directly from a third-party purchaser for such royalty owner's share of oil or gas production with or without a previously made agreement.

<u>Id.</u>

oil or gas production, the issuance of a division order, and "any

other voluntary communication" from the operator or first

purchaser to the interest owner or any governmental agency

recognizing the interest owner's rights as the authentication and

adoption of a security agreement.  Id. at § 9-339a(a).  Unlike in

some states with similar statutes, however, this security

interest is not automatically perfected in Kansas.  Instead, § 9-

339a(b) provides that:

> In order for any interest owner to claim the
> security interest provided by this section,
> an affidavit of production must be filed as
> prescribed by K.S.A. 55-205, and amendments
> thereto, which affidavit must show that a
> well or wells capable of producing in paying
> quantities have been completed on the
> pertinent oil and gas lease or leases and
> lands covered thereby. This filing is
> effective as a financing statement covering
> as-extracted collateral as provided by K.S.A.
> 84-9-501, and amendments thereto, and the
> security interest provided by this section is
> perfected as of the date of recording. There
> is no requirement of refiling every five
> years to maintain the effectiveness of the
> filing.

Id. at § 9-339a(b).

Thus, a perfected security interest arising under Kansas §

9-339 does not require an actual written security agreement or

the filing of an actual financing statement.  Instead, the

security interest arises upon either (i) an agreement to purchase

oil or gas production, (ii) the issuance of a division order, or

(iii) "any other voluntary communication" that meets the

25

requirements set forth above, and is perfected upon the filing of an affidavit of production or its equivalent.

The security interests created by Kansas § 9-339a encumber: (i) oil and gas production in the possession of the first purchaser, and (ii) proceeds thereof received by or due to the first purchaser.  Id. at § 9-339a(c).  These security interests exist "for an unlimited time" if:

> (A)   The proceeds are oil or gas production, inventory of raw, refined or manufactured oil or gas production, or rights to or products of any of these, although the sale of such proceeds by a first purchaser to a buyer in the ordinary course of business as provided in subsection (e) will cut off the security interest in those proceeds;

> (B)   the proceeds are accounts, chattel paper, instruments and documents; or

> (C)   the proceeds are cash proceeds.

Id. at § 9-339a(c)(1)(A), (B), and (C).

Section 9-102(a)(9) defines "cash proceeds" as "proceeds that are money, checks, deposit accounts, or the like."  Id. at § 9-102(a)(9).  Otherwise the security interest exists "for the length of time provided by K.S.A. 84-9-315, and amendments thereto, as to all other proceeds."  Id. at § 9-339a(c)(2).  Kansas § 9-339a recognizes the historic practice of allowing full payment from a buyer in the ordinary course to ultimately discharge the interest owner's security interest, however.  See

id. at § 9-339a(e).

Moreover, Kansas § 9-339a(j) provides that a security interest created by the statute "remains effective against the debtor and perfected against the debtor's creditors even if assigned, regardless of whether the assignment is perfected against the assignor's creditors.  If a deed, mineral deed, assignment of oil or gas lease, or other such writing evidencing the assignment is filed in the real estate records of the county, it will have the same effect as filing an amended financing statement under K.S.A. 84-9-515, and amendments thereto."  Id. at § 9-339a(j).

In addition to, and not to be confused with the interest owners' security interests in oil and gas and resulting proceeds, Kansas § 9-339a provides for the creation of a statutory lien that "secures the payment of all taxes that are or should be withheld or paid by the first purchaser, and a lien that secures the rights of any person who would be entitled to a security interest under subsection (c)(1)(A) of this section except for lack of any adoption of a security agreement by the first purchaser or a lack of possession or writing required by K.S.A. 84-9-201 or 84-9-203, and amendments thereto, for the security interest to be enforceable."  Id. at § 9-339a(d).[9]

---

[9]     The issue of the Kansas Producers' rights with respect to the statutory lien provided by Kansas § 9-339a is not currently before the Court.

As noted briefly above, the Banks argue that Kansas § 9-339a(b)'s language stating that the filing of an affidavit of production is required to perfect the security interests asserted by the Kansas Producers, and that such a filing "is effective as a financing statement covering as-extracted collateral as provided by K.S.A. 84-9-501" indicates that Kansas § 9-339a only provides a security interest in as-extracted collateral. This argument is significant, because both sides acknowledge that Kansas' definition of "as-extracted collateral" would exclude the Kansas Producers. K.S.A. § 84-9-102(a)(6) defines "as-extracted collateral" as:

> (A)  Oil, gas, or other minerals that are
>      subject to a security interest that:
>
>   (i)  Is created by a debtor having an
>        interest in the minerals before
>        extraction; and
>
>   (ii) attaches to the minerals as
>        extracted; or
>
> (B)  accounts arising out of the sale at the
>      wellhead or minehead of oil, gas, or
>      other minerals in which the debtor had
>      an interest before extraction.

Id. at § 9-102(a)(6).

The Kansas Producers, meanwhile, argue that the phrase "effective as a financing statement covering as-extracted collateral" means that the filing of an affidavit of production gives a party the same rights they would have if they filed a financing statement covering "as-extracted collateral" under

28

Kansas law.

This Court believes that, were it to consider the issue, the Kansas Supreme Court would embrace the Kansas Producers' reading on this point, based on the plain language of the statute.  In so holding, the Court finds that the language of Kansas § 9-339a(b) cannot be read as limiting the security interests provided by Kansas § 9-339a to security interests arising in as-extracted collateral.  Moreover, the structure of Kansas § 9-339a counsels against the reading espoused by the Banks as well.  Subsection (b), in which the disputed language appears, is the subsection governing perfection.  Were the Bank's reading correct, such language would most likely be found in subsection (a) or (c), each of which address the scope of the security interest created by Kansas § 9-339a.

      b. <u>Priority</u>

Subsection (f)(1) of Kansas § 9-339a provides that "[s]ecurity interests created by this section shall be treated as purchase money security interests for purposes of determining their relative priority under K.S.A. 84-9-322, 84-9-323 or 84-9-324, and amendments thereto; holders of these security interests are not required to give the written notices as provided by K.S.A. 84-9-324, and amendments thereto, to enjoy purchase money priority over security interests with a prior financing statement covering inventory."  <u>Id.</u> at § 9-339a(f)(1).

Sections 9-322 and 9-323 are the Kansas UCC's general priority and future advances sections, respectively.  The last section referred to, Kansas § 9-324, is the Kansas UCC's section governing priority of purchase money security interests.

Of particular importance to the instant dispute are the provisions of Kansas § 9-324(a) and (b):

> (a) Except as otherwise provided in subsection (g), a perfected purchase-money security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods, and, except as otherwise provided in K.S.A. 84-9-327 and amendments thereto, a perfected security interest in its identifiable proceeds also has priority, if the purchase-money security interest is perfected when the debtor receives possession of the collateral or within 20 days thereafter.

> (b) Subject to subsection (c) and except as otherwise provided in subsection (g), a perfected purchase-money security interest in inventory has priority over a conflicting security interest in the same inventory, has priority over a conflicting security interest in chattel paper or an instrument constituting proceeds of the inventory and in proceeds of the chattel paper, if so provided in K.S.A. 84-9-330 and amendments thereto, and, except as otherwise provided in K.S.A. 84-9-327 and amendments thereto, also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if:

> (1)   the purchase-money security
>       interest is perfected when the
>       debtor receives possession of the
>       inventory;
>
> (2)   except where excused by K.S.A.
>       84-9-340, and amendments thereto,
>       the purchase-money secured party
>       sends an authenticated notification
>       to the holder of the conflicting
>       security interest;
>
> (3)   the holder of the conflicting
>       security interest receives any
>       required notification within five
>       years before the debtor receives
>       possession of the inventory; and
>
> (4)   the notification states that the
>       person sending the notification has
>       or expects to acquire a
>       purchase-money security interest in
>       inventory of the debtor and
>       describes the inventory.

Id. at § 9-324(a),(b).

The parties vigorously dispute just how Kansas § 9-339(f)(1) interacts with Kansas § 9-324, § 9-324(b).  The parties all acknowledge that Kansas § 9-339a(o) provides that "[t]he rights of any person claiming under a security interest or lien created by this section are governed by the other provisions of [Article 9] except to the extent that this section necessarily displaces those provisions."  But the parties disagree regarding the question of whether Kansas § 9-339a, including but not limited to subsection (f)(1), necessarily displaces Kansas § 9-324.  The Kansas Producers argue that it does.  The Banks argue that it does not.

31

The Banks contend that Kansas § 9-339a(f)(1)'s language
dictating that the security interests created by Kansas § 9-
339a(a) "shall be treated as purchase money security interests
for purposes of determining their relative priority under K.S.A.
84-9-322, 84-9-323 or 84-9-324, and amendments thereto" means
just what it says.  That is, the Banks contend that the PMSI
priority created by Kansas § 9-339a(f)(1) is no more or less
broad than any other PMSI in inventory would be, and is thus
subject to the same cutoff rules as all other PMSIs in inventory.
This is the case, they contend, because nothing in any part of
Kansas § 9-339a expressly provides otherwise.  Consequently, the
general rules regarding PMSIs in Kansas § 9-324 are not displaced
by Kansas § 9-339a, and, as per Kansas § 9-339a(o), the general
rules therefore govern the terms of the PMSI created by Kansas §
9-339a(f)(1).

By contrast, the Kansas Producers posit that Kansas § 9-339a
was intended to be, and is, a self-contained statutory provision
that completely governs the rights of interest owners with
respect to the security interests provided therein in oil and gas
and resulting proceeds.  In support of this argument, the Kansas
Producers cite examples of other provisions of Kansas § 9-339a –
distinct from subsection (f)(1) – contradicting other provisions
of Kansas' Article 9.

The Kansas Producers also argue that Kansas § 9-324 is

32

directly displaced by Kansas § 9-339a(c), when read in conjunction with Kansas § 9-339a(a).  Kansas § 9-339a(c) provides that the security interest granted to the Kansas Producers by the remainder of Kansas § 9-339a

> exists in oil and gas production, and also in the following proceeds of such production owned by, received by, or due to the first purchaser:
>
> (1) For an unlimited time if:
>
> > (A)  The proceeds are oil or gas production, inventory of raw, refined or manufactured oil or gas production, or rights to or products of any of these, although the sale of such proceeds by a first purchaser to a buyer in the ordinary course of business as provided in subsection (e) will cut off the security interest in those proceeds;
> >
> > (B)  the proceeds are accounts, chattel paper, instruments and documents; or
> >
> > (C)  the proceeds are cash proceeds.[10]

Id. at § 9-339a(c)(1).

Finally, the Kansas Producers argue that the operation of the oil and gas industry supports construing those entitled to PMSI priority under the Kansas statute broadly.  Put simply, they contend that, as a practical matter, the oil and gas industry

---

[10]    Kansas § 9-102(a)(9) defines "cash proceeds" as "proceeds that are money, checks, deposit accounts, or the like." K.S.A. § 84-9-102(a)(9).

works in such a manner that PMSI priority would, under Kansas §
9-324(b), always be limited to inventory still in the hands of a
first purchaser (or, in the case of bankruptcy, inventory still
in the hands of a first purchaser on the day the bankruptcy
petition is filed).  The Kansas Legislature, they argue, must
have intended for the PMSI priority to extend more broadly.[11]

On this point, the Court believes that the Kansas Supreme
Court would adopt the Banks' reading based on the plain language
of Kansas § 9-339a.  In so doing, the Court holds that the
general rules regarding PMSIs in Kansas § 9-324 are not displaced
by Kansas § 9-339a and therefore serve to govern Kansas § 9-339a.

To embrace the Kansas Producers' argument that Kansas § 9-
339a is a self-contained statutory provision would essentially
read Kansas § 9-339a(o)'s directive regarding when the section is
governed by other Article 9 provisions out of the statute.
Moreover, the Kansas Producers' examples where other parts of
Kansas § 9-339a, which are unrelated to Kansas § 9-324's language
regarding PMSI priority, displace other sections of Kansas'
version of Article 9 are irrelevant to the issue of whether
Kansas § 9-324 is displaced by Kansas § 9-339a.  Displacement of
Article 9 by Kansas § 9-339a is not an all-or-nothing

---

[11]   The Kansas Producers do make one other argument in
which they discuss Kansas § 9-324(g), which governs priority
between competing PMSIs in the same collateral.  Because the
Banks do not have or assert PMSI security interests, however, the
Court need not address this argument.

proposition; Kansas § 9-339a can displace some sections, but not others.

What is relevant is whether specific language in Kansas § 9-339a necessarily displaces Kansas § 9-324's rules regarding PMSI priority in inventory, and the only language offered by the Kansas Producers is insufficient to support the proposition.  The Kansas Producers essentially argue that when Kansas § 9-339a(a), (b), (c), and (f) are read together, they state that the security interest "provided by this section" shall be "treated as purchase-money security interests" in dealing with other security interests not provided by § 9-339a, and shall continue "[f]or an unlimited time" in most forms of proceeds.  Put another way, the Kansas Producers argue that Kansas § 9-339a(c)'s "unlimited time" language necessarily displaces Kansas § 9-324(b)'s limitations on the life of a PMSI in inventory.

The main problem with this reading, however, is that it overlooks exactly what it is that continues for an unlimited time under Kansas § 9-339a(c): the Kansas Producers' security interest, not the Kansas Producers' PMSI priority.  Had the Kansas Legislature wanted the Kansas Producers' PMSI to continue for an unlimited time, it could have expressly stated as much, but it did not.  Instead, it gave the Kansas Producers a security interest that continues for an unlimited time in most forms of proceeds, and it provided that this security interest is "treated

35

as" a PMSI.  To see what type of priority a PMSI enjoys under
Kansas law (and to what collateral it attaches), however, the
Court must look to Kansas § 9-324, including Kansas § 9-324(b) in
the case of inventory.  Otherwise, the Court would be at a loss
for how to treat the Kansas Producers' security interests as
PMSIs.

Thus, the Court holds that, pursuant to Kansas § 9-324(b),
the Kansas Producer's PMSI priority is limited to inventory on
hand at the time the Debtors filed bankruptcy, any identifiable
cash proceeds that the Debtors received prior to delivery of the
oil and gas production to the subsequent purchaser, and certain
chattel paper.  Id. at § 9-324(b).

But the Kansas Producers who meet the requirements set forth
in Kansas § 9-339a could still be granted a security interest if
Kansas law governs perfection in this adversary proceeding, even
if they do not qualify for PMSI priority, and these security
interests could prove quite valuable.  As noted above, subsection
(a) of Kansas § 9-339a provides for the creation of a security
interest in favor of interest owners and provides that "[a]
signed writing giving the interest owner a right under real
estate law operates as a security agreement created under
[Article 9]."  K.S.A. § 84-9-339a(a).  Subsection (b) of Kansas §
9-339a, meanwhile, provides for perfection of this security
interest by the filing of an affidavit of production and, more

36

importantly, dictates that such a filing "is effective as a financing statement covering as-extracted collateral as provided by K.S.A. 84-9-501, and amendments thereto, and the security interest provided by this section is perfected as of the date of recording. There is no requirement of refiling every five years to maintain the effectiveness of the filing." Id. at § 9-339a(b). Moreover, Kansas § 9-339a provides that a security interest (or statutory lien) created by the statute "remains effective against the debtor and perfected against the debtor's creditors even if assigned, regardless of whether the assignment is perfected against the assignor's creditors." Id. at § 9-339a(j). If a deed, mineral deed, assignment of oil or gas lease, or other such writing evidencing the assignment is filed in the real estate records of the county, it will have the same effect as filing an amended financing statement under K.S.A. 84-9-515, and amendments thereto. Id.

Section § 9-322 of Kansas' version of Article 9 provides that "conflicting perfected security interests ... rank according to priority in time of filing or perfection. Priority dates from the earlier of the time of a filing covering the collateral is first made or the security interest ... is first perfected." Id. at § 9-322(a)(1). For purposes of subsection (a)(1), "[t]he time of filing or perfection as to a security interest in collateral is also the time of filing or perfection

37

as to a security interest in proceeds."  Id. at § 9-322(b)(1).

In practice, any given Kansas Producer may have filed an affidavit of production in the applicable county clerk's office before the Banks' financing statement was filed.  Accordingly, under the "first to file or perfect" rule, the Kansas Producers' security interests in collateral such as oil and gas production, accounts, cash, exchanged oil and gas, and the like, which extend for an unlimited time pursuant to § 9-339a(c), would take priority under Kansas law over the Banks' competing Article 9 security interest in the same collateral to the extent that such affidavits of production benefiting the Kansas Producers were filed prior to the Banks' financing statements covering the same collateral.

To the extent that creditors possess unperfected security interests, however, they will be subordinate to a perfected security interest in the same collateral under Kansas' Article 9 priority rules.  This is because Kansas § 9-322(a)(2) provides that "[a] perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien."

## 2. Delaware law

Delaware's version of Article 9 applies to, inter alia,  "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract."  6 Del.

38

C. § 9-109.  In this regard, the scope of Delaware's Article 9 is identical to Kansas § 9-109, and 12A Okl. St. Ann. § 1-9-109.

As noted above, Kansas § 9-339a is a non-uniform amendment to Kansas' version of Article 9 of the UCC.  Delaware's version of Article 9 does not contain a similar provision providing for automatic perfection of a security interest to producers of oil and gas.  Instead, oil and gas producers seeking to perfect a security interest under Delaware law are left to do so via Article 9's traditional methods of perfection.  These include filing a financing statement, taking possession of the collateral, and, when appropriate, obtaining "control" over the collateral.

To the extent that Delaware law governs perfection and certain creditors, such as the Kansas Producers, fail to perfect security interests in Delaware before the relevant debtor files bankruptcy, these creditors will be subordinate to a creditor who has a perfected security interest in the collateral in question under Delaware's Article 9 priority rules.  See id. at § 9-322(a)(2).

### 3. Oklahoma law

Like Delaware's version of Article 9, Oklahoma's UCC does not contain a provision similar to Kansas § 9-339a.[12]  Thus,

---

[12]    Oklahoma does have a lien statute that serves a similar purpose, but these liens are separate and distinct from Article 9 security interests, as well as subordinate to perfected security

39

producers of oil and gas who wish to perfect an Article 9
security interest under Oklahoma law must either file a financing
statement in Oklahoma, take possession of the collateral in
question, where allowed, or obtain control over the collateral in
question, again where allowed, in order to do so.  To the extent
producers fail to properly perfect their security interest via
one of these methods, any security interest they possess will be
unperfected under Oklahoma law.  Just as in Delaware and Kansas,
an unperfected security interest will be subordinate to a
perfected security interest under Oklahoma's Article 9 priority
rules.  See 12A Okl.St.Ann. § 1-9-322.

**4. Choice of law**

The issues before this Court with respect to the claims of
the Kansas Producers are: (i) whether, under applicable choice of
law principles, Kansas law governs the perfection and/or priority
of the Kansas Producers' claimed security interests against the
Debtors; and (ii) if Kansas law applies and if the Kansas
Producers have perfected security interests thereunder, whether
and to what extent the Kansas Production and the proceeds thereof
have priority over the competing Article 9 security interests of
the Banks.

a. Governing law of perfection

---

interests under Oklahoma law.  See Arkla Exploration Co. v.
Norwest Bank of Minneapolis, 948 F.2d 656, 660 (10th Cir. 1991).

"When two states have a connection to a case and an issue arises on which the states' respective laws differ, a choice of law must be made." PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.), 128 Fed. Appx. 839, 843 (3d Cir. 2005). See also Huber v. Taylor, 469 F.3d 67, 74, 76 (3d Cir. 2006) (where there is "a true conflict between ... potentially applicable bodies of law" it is necessary "to examine the law of all the relevant jurisdictions") (emphasis in original). Here, Kansas §  9-339a is a non-uniform amendment to the UCC, which differs from the standard UCC rules regarding the perfection and priority of security interests. Accordingly, this Court must determine which states' laws govern (i) perfection of the Kansas Producers' alleged security interests in the Kansas Product and the proceeds thereof and (ii) whether the Kansas Producers' claimed security interests in the Debtors' assets have priority over the Bank's conflicting security interest in the same assets. The fact that Kansas enacted non-uniform provisions of the UCC concerning Kansas oil and gas does not end the inquiry as to whether the security interests claimed by the Kansas Producers have priority over the competing security interests of the Banks in assets of the relevant Debtors – a Delaware entity and two Oklahoma entities.

In the absence of a specific federal policy or interest dictating the use of federal choice of law rules, it is well

settled in this Circuit that a bankruptcy court faced with the
issue of which substantive state law to apply to a claim for
relief in an adversary proceeding applies the choice of law rules
of the forum state.  PHP Liquidating, 128 Fed. Appx. at 843 (3d
Cir. 2005); Robeson Indus. Corp. v. Hartford Accident & Indemn.
Co., 178 F.3d 160, 164-65 (3d Cir. 1999); Charan Trading Corp. v.
Uni-Marts, LLC (In re Uni-Marts, LLC), 399 B.R. 400, 414 n.4
(Bankr. D. Del. 2009); Pickett v. Integrated Health Servs., Inc.
(In re Integrated Health Services, Inc.),  304 B.R. 101, 106
(Bankr. D. Del. 2004), aff'd, 233 Fed. Appx. 115, 118 n.2 (3d
Cir. 2007).  Because Klaxon v. Stentor Elec. Mfg. Co., 313 U.S.
487, 496 (1941), "make[s] clear that federal law may not be
applied to questions which arise in federal court but whose
determination is not a matter of federal law," In re Merritt
Dredging Co., 839 F.2d 203, 206 (4th Cir. 1988), state choice of
law rules must be applied in adversary proceedings in bankruptcy
court.

The Kansas Producers argue that in deciding the choice of
law question here, this Court should not apply Delaware's choice
of law rules and should instead assess which state has the "most
significant contacts and relationships."  (See Ks. Pls. Opp. Br.
at 10 (adopting Texas Producers' choice of law argument); Tex.
Pls. Opp. Br. at p. 20).  However, while Vanston Bondholders
Protective Comm. v. Green, 329 U.S. 156 (1946), on which

42

Plaintiffs rely, "contains some broad statements that may be read to suggest that bankruptcy courts should not adopt the choice of law rules of the forum state," the Court did not hold that federal choice of law rules apply to state law claims in adversary proceedings in bankruptcy courts.  Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 606-07 (2d Cir. 2001).  Thus, the holding in Vanston does not conflict with the Bank's position here that the forum's choice of law principles apply.

In sum, applicable Third Circuit precedent makes clear that Delaware's choice of law rules regarding perfection and priority of UCC security interests apply to the claims of the Kansas Producers in these adversary proceedings.  This Court is not free to disregard Article 9's choice of law rules and engage in its own ad hoc assessment of which states have the most significant contacts here.[13]

In resolving choice of law questions, Delaware courts apply the Restatement (Second) of the Law Conflict of Laws ("Restatement").  Travelers Indem. Co. v. Lake, 594 A.2d 38, 46-47 (Del. 1991); Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc., 394 A.2d 1160, 1166 (Del. 1978).  Under the Restatement, a court "will follow a statutory directive of its own state on

---

[13]     The Court also notes that Delaware, Oklahoma and Kansas have each adopted choice of law statutes that are identical in all material respects: Article 9's standard choice of law provisions.

choice of law." Restatement § 6(1). As the Comment to this Restatement section states, "[t]he court must apply a local statutory provision directed to choice of law provided that it would be constitutional to do so. An example of a statute directed to choice of law is the Uniform Commercial Code which provides in certain instances for ... the application of the law of a particular state." Section 9-301 of the Delaware UCC, Del. Code Ann. tit. 6, § 9-301 (Delaware § 9-301), titled "Law governing perfection and priority of security interests," is precisely such a statutory directive. Delaware § 9-301 governs choice of law determinations with respect to non-uniform amendments to the UCC regarding the perfection and priority of security interests, such as Kansas § 9-339a. Delaware § 9-301 must be applied as written.

There is no merit to the contention of the Kansas Producers that Delaware § 9-301 does not apply here. Citing § 9-109(a)(1) of the Delaware UCC, they have asserted that Delaware's UCC, including § 9-301, is inapplicable because the "purchase money security interests" they claim are created by statute, and thus are statutory liens, not Article 9 UCC security interests that arise "by contract." (See Ks. Pls. Opp. Br. at 10)(adopting Texas Producers' choice of law argument)).[14]

---

[14]    Lest there be any confusion, the Kansas Producers make this argument with regard to the security interest created by Kansas § 9-339a(a), not the lien created by Kansas § 9-339a(d).

Kansas § 9-339a makes clear that it creates a security
interest that can arise only by contract and that is within the
scope of both Kansas' and Delaware's version of Article 9.[15]
Plaintiffs rely on subsection (a) of Kansas § 9-339a, which
creates "a security interest in favor of interest owners (as
secured parties) to secure the obligations of the first purchaser
of oil and gas production (as debtor) to pay the purchase price."
But the statute specifically provides that "[a] signed writing
giving the interest owner a right under real estate law operates
as a security agreement created under article 9 of chapter 84 of
the Kansas Statutes Annotated, and amendments thereto."  See
Kansas § 9-339a(a).  It also states that:

> [t]he act of the first purchaser in signing
> an agreement to purchase oil or gas
> production, in issuing a division order, or
> in making any other voluntary communication
> to the interest owner or any governmental
> agency recognizing the interest owner's
> right operates as an authentication and

---

As noted above, interpretation of Kansas § 9-339a(d) is not
before the Court at this time.  But the presence of subsection
(d) does show that the Kansas Legislature drew distinctions
between a lien and a security interest when it enacted Kansas §
9-339a.

[15]    Both Kansas and Delaware have adopted the exact same
language regarding the scope of their respective versions of
Article 9 in all respects material to this dispute.  Accordingly,
in order for the Kansas Producers' security interest to be
outside the scope of Delaware's version of Article 9, it would
also have to be outside the scope of Kansas' version of Article
9.  The Kansas Legislature clearly did not intend for this to be
the case, given that Kansas Article 9 governs Kansas § 9-339a to
the extent it is not displaced by the statute.

adoption of the security agreement in
accordance with K.S.A. 84-1-201(39), and
amendments thereto.

Id.

When asked to interpret a similar statute, Texas § 9.343,
the court in In re Enron North America Corp., 312 B.R. 27
(S.D.N.Y. 2004), stated that the Texas law "was designed to
'mirror[] the creation of a consensual security interest by
deeming that certain standard conveyancing and marketing
instruments fulfill the documentation requirements imposed by
article 9 [of the UCC].'" Id. at 31 (quoting In re Enron Corp.,
302 B.R. 455, 459 (Bankr. S.D.N.Y. 2003)).  Kansas § 9-339a,
which was modeled after the Texas statute and tracks its language
to a great extent, is structured the same way.  Therefore, this
Court concludes that the Kansas Producers claim consensual
security interests that arise by contract, not statutory liens or
similar statutory interests, and considers the choice of law
issue in this context.

The Kansas Producers argue that, even if the Delaware UCC
were to govern, that it defers to a statute such as Kansas §
9-339a in two separate instances.  The first such instance is
Delaware § 9-109(c)(3), which provides that Delaware's version of
Article 9 does not apply to the extent that "a statute of another
State, a foreign country, or a governmental unit of another State
or a foreign country, other than a statute generally applicable

46

to security interests, expressly governs creation, perfection, priority, or enforcement of a security interest created by the State, country, or governmental unit."  6 Del. C. § 9-109(c)(3). It is well-settled, however, that this languages only addresses governmental debtors.  See id. at § 9-109 official cmt. ¶ 9. Thus, it is inapplicable to this case.

The second instance is no more persuasive.  The Kansas Producers cite Official Comment 7 to Delaware § 9-320.  This Comment states, in the context of a discussion of Delaware § 9-320(d), that:

> Under subsection (d), a buyer in ordinary course of business of minerals at the wellhead or minehead or after extraction takes free of a security interest created by the seller.  Specifically, it provides that qualified buyers take free not only of Article 9 security interests but also of interests "arising out of an encumbrance." ...  This issue is significant only in a minority of states.  Several of them have adopted special statutes and nonuniform amendments to Article 9 to provide special protections to mineral owners, whose interests often are highly fractionalized in the case of oil and gas.  See Terry I. Cross, Oil and Gas Product Liens--Statutory Security Interests for Producers and Royalty Owners Under the Statutes of Kansas, New Mexico, Oklahoma, Texas and Wyoming, 50 Consumer Fin. L. Q. Rep. 418 (1996).  Inasmuch as a complete resolution of the issue would require the addition of complex provisions to this Article, and there are good reasons to believe that a uniform solution would not be feasible, this Article leaves its resolution to other legislation.

6 Del. C. § 9-320(d) official cmt. ¶ 7 (emphasis added).

47

The Kansas Producers argue that the language emphasized above indicates that the Delaware UCC defers to these nonuniform UCC provisions governing oil and gas production.  Putting aside the fact that this language is from an Official Comment, and not from statutory text, the Court holds otherwise.  Stating that a "uniform solution" to such oil and gas interests "would not be feasible" and is therefore left to "other legislation" does not mean that Delaware law defers to such "other legislation." Rather, this language, which was adopted from model Article 9, merely recognizes that some states will enact non-uniform UCC amendments on the subject governed by Delaware § 9-320(d).  The Court's interpretation of Comment 7 is further supported by the fact that the Comment does not accompany one of Delaware's choice of law provisions, but rather a provision governing the extinguishment of security interests in oil and gas by a buyer in the ordinary course.

Application and enforcement of Article 9's choice of law rules here would also further a "primary goal" of the UCC, i.e., "'to promot[e] certainty and predictability in commercial transactions.'"  Shell Oil v. HRN, Inc., 144 S.W.3d 429, 435 (Tex. 2004) (quoting Am. Airlines Employees Fed. Credit Union v. Martin, 29 S.W.3d 86, 92 (Tex. 2000)).  "One of the principal purposes of the 2001 changes in Article 9 of the UCC was to require that all UCC security interest filings for a given

48

corporation be made in the corporation's state of incorporation."
In re Aura Systems, Inc., 347 B.R. 720, 724 (Bankr. C.D. Cal.
2006).

Original Article 9 provided that the state where collateral
was located was usually the proper location for perfecting a
security interest.  See UCC 9-301 official cmt. ¶ 4.  This law
was unsatisfactory to the American Law Institute (ALI) and the
Uniform Law Commission of The National Conference of
Commissioners on Uniform State Laws (NCCUSL), the entities
responsible for the drafting of Revised Article 9, for two
reasons.  See id.  First, lenders seeking a security interest in
a corporation's collateral would have to examine the filings in
all states where the corporation had collateral to make sure that
there was no outstanding encumbrance in such collateral, and they
were required to file financing statements in every state where
such collateral was located.  See id.  This process was deemed
overly burdensome on commerce, and consequently Revised Article 9
"reduces the number of filing offices in which secured parties
must file or search when collateral is located in several
jurisdictions."  Id.

Second, personal property is frequently moved from state to
state.  Under original Article 9, "a secured creditor could lose
its security interest if it did not adequately keep track of the
location of its collateral and take appropriate subsequent steps,

within an appropriate time frame, to maintain its secured status
by filing in the new state or states where the collateral came to
rest." <u>Aura Systems</u>, 347 B.R. at 724 (citing UCC § 9-103 (1972)
(amended effective July 1, 2001)).  "In addition, a secured
creditor would have to investigate the provenance of collateral
to find out if it was subject to a prior perfected security
interest in another state."  <u>Id.</u>

     As has been noted elsewhere, "[t]he goal of the 2001
amendments here at issue was to make a UCC security interest
filing permanent and easy to find."  <u>Id.</u>  This is in keeping with
the longstanding goal of Article 9 "to create a simple and clear
notice filing system."  <u>First Agri Serv., Inc. v. Kahl, et al.</u>,
385 N.W.2d 191, 196 n.9 (Wis. Ct. App. 1986).  For an Oklahoma
corporation, for instance, a potential creditor now can simply
examine the UCC filings in Oklahoma to determine whether there is
a financing statement covering any collateral belonging to the
corporation anywhere in the United States.[16]  Ignoring Article
9's choice of law rules would not only compromise this system and
unravel a national, notice-filing system, but also would ignore
the enactment of UCC 9-301 by each state legislature that is in
any way even remotely involved in this adversary proceeding,

---

     [16]    Subject to narrow exceptions for property more closely
affiliated with real property than normal personal property, such
as fixture filings and, as noted below, security interests in
"as-extracted collateral."

including Kansas.

Thus, this Court will apply Delaware § 9-301 to determine which states' substantive laws govern perfection and priority of the security interests claimed by the Kansas Producers.  The general rule of Delaware (and Kansas and Oklahoma) § 9-301 is that the location of the debtor governs perfection.  Del. Code Ann. tit. 6, § 9-301(1).  As Official Comment 4 to Delaware § 9-301 states, "the law governing perfection of security interests ... is the law of the jurisdiction of the debtor's location, as determined under Section 9-307."  Section 9-307(e) provides that the location of a registered organization is the state in which the entity was organized.  Thus, the locations of SemCrude, Eaglwing and SemGas are Delaware, Oklahoma and Oklahoma, respectively.  None of these three Debtors is "located" in Kansas.

Under Delaware § 9-301, the law of the location of the relevant Debtor governs perfection of the Kansas Producers' claimed security interests to the extent that, as of the Petition Date, that Debtor had possession of the oil and gas originating from the Texas Producers or proceeds thereof in the form of exchanged oil or gas.  The law of the location of the relevant Debtor also governs perfection of proceeds of the Kansas Product held in the form of accounts receivable as of the Petition Date. See id. at § 9-301 official cmt. ¶ 3, Example 1.

Under Delaware § 9-301, the only relevant exception to the
general rule that the law of the location of the Debtor governs
perfection is Delaware § 9-304(a).  That section provides, with
respect to cash proceeds of the Kansas Product held by the
Debtors in bank accounts as of the Petition Date, that "[t]he
local law of [the] bank's jurisdiction governs perfection."  A
"bank's jurisdiction for purposes of this" provision means, in
general, the law that the bank and the debtor or customer agreed
would apply or, if there is no such agreement, the law of the
place where the office in which the account is located.  Id. at §
9-304(b).  Schedules filed by the Debtors in these cases show
that their cash, as of the Petition Date, was held in a bank
located in Oklahoma.  (Eaglwing, L.P. First Amended
Schedules/Statements, Sch. B [Case No. 08-11525, Docket No.
1927]; SemCrude, L.P. First Amended Schedules/Statements, Sch. B
[Case No. 08-11525, Docket No. 1926]; SemGas, L.P. First Amended
Schedules/Statements, Sch. B [Case No. 08-11525, Docket No.
1936]).  Therefore, the perfection of security interests in cash
proceeds of Kansas Product is governed by Oklahoma law, not
Delaware or Kansas law.[17]

The Court also acknowledges that Delaware § 9-301(4)
provides that "[t[he local law of the jurisdiction in which the

---

[17]    No party has asserted that there is an agreement
between the Bank of Oklahoma and the Debtors that calls for the
application of any law other than Oklahoma.

wellhead or minehead is located governs perfection, the effect of
perfection or nonperfection, and the priority of a security
interest in as-extracted collateral."  As noted above, the Kansas
Producers who have filed an affidavit of production in Kansas are
deemed to have filed a financing statement covering as-extracted
collateral.  To the extent that this language transforms the
Kansas Product into "as-extracted collateral," it does so only
under Kansas law.  Because the Kansas Product does not fit within
Delaware's definition of "as-extracted collateral," however, the
rule in Delaware § 9-301(4) is not triggered.  That is, the
Kansas Product is not considered to be as-extracted collateral
under Delaware law, thus the exception for as-extracted
collateral in Delaware § 9-301(4) does not apply.

Consequently, Kansas § 9-339a does not govern in deciding
whether the Kansas Producers' claimed security interests were
perfected.  Rather, Delaware law or Oklahoma law govern
perfection.  Under either Delaware law, Del. Code Ann. tit. 6, §
9-310(a), or Oklahoma law, Okla. Stat. tit. 12A, § 1-9-310(a),
the Producers would have had to file UCC financing statements in
those states to perfect their security interests in the Kansas
Product and the proceeds thereof.  Thus, the Court concludes that
unless the Kansas Producers can show in Phase II of this
litigation that they have properly filed financing statements in
Delaware or Oklahoma, as applicable, they do not have perfected

53

security interests in the Kansas Product, or the proceeds
thereof.

     b. <u>Governing law of priority</u>

Assuming, arguendo, that the Kansas Producers properly filed
UCC financing statements with respect to the Kansas Product and
proceeds thereof prior to the Petition Date, the law governing
the priority of the Kansas Producers' claimed security interests
relative to competing Article 9 security interests would also be
determined by Delaware § 9-301.

Pursuant to Delaware § 9-301, priority is decided under the
law of the Debtor's location unless one of the exceptions
enumerated in Delaware § 9-301 applies.  Here, as set forth
below, the Kansas Producers' alleged security interests in Kansas
Product and proceeds thereof in the form of exchanged oil and gas
and cash are all exceptions to the general rule.  Only the
priority of the Kansas Producers' claimed security interest in
proceeds of the Kansas Product held by Debtors in the form of
accounts receivable as of the Petition Date is determined under
the law of the Debtor's location, be it Delaware or Oklahoma.

One applicable exception to the general rule of Delaware §
9-301 is set forth in § 9-301(3)(C), which provides that "while
... goods ... [are] located in a jurisdiction, the local law of
that jurisdiction governs ... the priority of a nonpossessory
security interest in the collateral."  Under this exception, to

the extent that the Debtors held, as of the Petition Date, Kansas Product or exchanged oil or gas proceeds, the law of the state in which the collateral was located as of the Petition Date would determine the priority of the Kansas Producers' claimed security interests.

The other relevant exception concerning priority is Delaware § 9-304, which prescribes the "[l]aw governing perfection and priority of security interests in deposit accounts."  Under Delaware § 9-304, because the Debtors' bank accounts were located in Oklahoma, Oklahoma law governs the priority of the Kansas Producers' alleged security interests in cash proceeds held in Oklahoma deposit accounts as of the Petition Date.  Under Oklahoma law, "[c]onflicting perfected security interests ... rank according to priority in time of filing or perfection." Okla. Stat. tit. 12A, § 1-9-322(a)(1).

Thus, even if the Kansas Producers had perfected security interests in the Kansas Product and the proceeds thereof, Kansas law would govern only the priority of the Kansas Producers' security interests in Kansas Product or proceeds thereof in the form of exchanged oil or gas held by the Debtors in Kansas as of the Petition Date.

**5. Analysis under governing law**

Either Delaware or Oklahoma law will govern perfection of the Kansas Producers' security interests provided by K.S.A. § 9-

339a.  The fact that these security interests may be entitled to perfection under Kansas Law is not dispositive, because Kansas law does not govern perfection of the Kansas Producers' claims against the defendants in this adversary proceeding.  In order to be perfected under Delaware and Oklahoma law, the Kansas Producers must have filed UCC-1 financing statements in both states, or perfected their security interest in another proper method under the state's respective versions of Article 9, such as by obtaining control over the Debtors' deposit accounts.

To the extent that the Kansas Producers have failed to perfect their security interests under Delaware and/or Oklahoma law, they are the holders of unperfected security interests, assuming they meet the other requirements set forth in Kansas §  9-339a.  As noted above, whether the law governing priority of security interests is that of Kansas, Oklahoma, or Delaware, unperfected security interests are subordinate to properly perfected security interests, such as the one claimed by the Banks in this case.  Under Kansas law, K.S.A. §  84-9-322(a)(2) provides that "[a] perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien."  As noted above, this same language also has been adopted in all other relevant states.

Accordingly, the Court holds that a security interest perfected only in Kansas will be subordinate to a security

interest that was duly perfected against the Debtors in the
appropriate state.  Consequently, the Kansas Producers' motion
for summary judgment is denied, and the Banks' motion for summary
judgment is granted.[18]

## V.  CERTIFICATION FOR DIRECT APPEAL

As noted at the outset of this Opinion, the Court rules
today on a true question of first impression.  The Court has
little doubt that this decision will be appealed.

Recent amendments to title 28 of the United States Code
afford this Court the option to certify a matter for direct
appeal to the Circuit Court of Appeals, assuming certain criteria
are met; the decision of whether to take the appeal rests, of
course, with the Court of Appeals.  Direct appeals are governed
by 28 U.S.C. § 158(d)(2), which provides, in relevant part, as
follows:

> (2)(A)   The appropriate court of appeals
> shall have jurisdiction of appeals
> described in the first sentence of
> subsection (a) if the bankruptcy
> court, the district court, or the
> bankruptcy appellate panel
> involved, acting on its own motion
> or on the request of a party to
> the judgment, order, or decree
> described in such first sentence,
> or all of the appellants and
> appellees (if any) acting jointly,
> certify that –

---

[18]   On account of its ruling regarding choice of law, the
Court does not reach the constitutional and other challenges that
the Banks and J. Aron have asserted against Kansas § 9-339a.

57

      (i)    the judgment, order or decree involves a question of law as to which there is no controlling decisions of the court of appeals for the circuit or of the Supreme Court the United States, or involves a matter of public importance;

    (ii)    the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

  (iii)    an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken; and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

In the present case, the Court finds that the statutory criteria are met: there is no governing law on the issue before the Court, and it appears that prompt consideration of the appeal may serve to advance these bankruptcy proceedings.  This last point is especially true given that the Debtors have recently filed a plan of reorganization and have expressed an intention to seek confirmation of such plan and emerge from bankruptcy in September, 2009.  Accordingly, the Court deems it appropriate to certify this matter <u>sua sponte</u> for direct appeal to the United States Court of Appeals for the Third Circuit.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that a security

interest perfected only in Kansas by virtue of Kansas § 9-339a will be subordinate to a security interest that was duly perfected against the Debtors in the appropriate state.  Accordingly, the Court will deny the Kansas Producers' motion for summary judgment, and grant the Banks' motion for summary judgment.

An appropriate order follows.

By the Court,

Dated: June 19, 2009                    _____
                                        Brendan Linehan Shannon
                                        United States Bankruptcy Judge